UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

UNITED STATES OF AMERICA,   ) DOCKET NO. 3:16-CR-221-6
                        )
    vs.               )
                        )
NICHOLAS FLEMING,         )
                        )
        Defendant.    )
_____ )

TRANSCRIPT OF SENTENCING HEARING
BEFORE THE HONORABLE MAX O. COGBURN, JR
UNITED STATES DISTRICT COURT JUDGE
JULY 8, 2019

APPEARANCES:

On Behalf of the Government:

    CHRISTOPHER RICHARD FENTON, ESQ.,
    WILLIAM HENRY BOWNE, III, ESQ.,
    United States Department of Justice
    Criminal Division, Fraud Section
    1400 New York Avenue, NW
    Washington, DC 20530

On Behalf of the Defendant:

    MARK C. MOORE, ESQ.,
    SAMANTHA K. LLOYD, ESQ.,
    Nexsen Pruet, LLC
    1230 Main Street, Suite 700
    PO Drawer 2426
    Columbia, South Carolina 29202

LAURA ANDERSEN, RMR
Official Court Reporter
United States District Court
Charlotte, North Carolina

1                    P R O C E E D I N G S
2    MONDAY, JULY 8, 2019:
3              (Court called to order at 2:09:)
4              THE COURT:  Good afternoon.
5              ALL COUNSEL:  Good afternoon, Your Honor.
6              THE COURT:  Okay.  We will call the case of United
7    States versus Nicholas Fleming.  Is the defendant ready?
8              MR. MOORE:  Yes, Your Honor.  This is Mark Moore and
9    Samantha Lloyd for Mr. Fleming, and he is ready.
10             THE COURT:  All right.  Thank you.
11             Is the government ready?
12             MR. FENTON:  Yes, Your Honor.  Christopher Fenton
13   and Bill Bowne for the government.
14             THE COURT:  All right.  Thank you.
15             All right.  Mr. Fleming, if you would please stand.
16             Do you recall appearing before a United States
17   Magistrate Judge for the purpose of entering a guilty plea in
18   this case?
19             THE DEFENDANT:  Yes.  Yes, Your Honor.
20             THE COURT:  These are going to be easy questions.
21   All I'm trying to do is to see what happened in the past in
22   determining voluntariness of your plea as we go forward.  So
23   this is going to be the questions I ask:
24             Do you remember being placed under oath at that
25   time?

1          THE DEFENDANT:  Yes, Your Honor.

2          THE COURT:  Do you remember answering the questions

3  of the Judge?

4          THE DEFENDANT:  Yes, Your Honor.

5          THE COURT:  Do you remember that those questions and

6  your answers to those questions were contained on a plea

7  transcript form?

8          THE DEFENDANT:  Yes, Your Honor.

9          THE COURT:  Did you sign that form indicating the

10  answers you gave the Judge that day were true and accurate to

11  the best of your knowledge?

12          THE DEFENDANT:  I did, Your Honor.

13          THE COURT:  Did you tell the Judge the truth that

14  day?

15          THE DEFENDANT:  Yes, Your Honor.

16          THE COURT:  If I were to ask you the same questions

17  today would your answers be the same?

18          THE DEFENDANT:  They would, Your Honor.

19          THE COURT:  Thank you.  Counsel, do you believe your

20  client fully understood the questions the Magistrate Judge

21  asked at the Rule 11 hearing?

22          MR. MOORE:  Yes, Your Honor.  I do.

23          THE COURT:  All right.  Thank you.

24          Mr. Fleming, did you answer the questions the way

25  you did, and are you going forward with your guilty plea today

1  because you did commit the crime you're pleading guilty to?

2          THE DEFENDANT:  Yes, Your Honor.

3          THE COURT:  All right.  Thank you.

4          Then based upon those representations and the

5  answers given by the defendant at the Rule 11 hearing before

6  the magistrate judge, the Court affirms the Judge's finding

7  that the defendant's plea was knowingly and voluntarily made.

8  The Court also affirms the Judge's finding that the defendant

9  understood the charges, the potential penalties, and the

10  consequences of his plea.

11          Accordingly, the Court affirms the Magistrate

12  Judge's acceptance of the defendant's plea of guilty at the

13  Rule 11 hearing and accepts the same here today.

14          Did the government have a factual basis?

15          MR. FENTON:  Yes, Your Honor.

16          THE COURT:  Okay.  And is that in the presentence

17  report?

18          PROBATION OFFICER:  Yes, Your Honor.

19          THE COURT:  All right.  Thank you.

20          Does the defense stipulate that the Court may use

21  the offense conduct set forth in the presentence report to

22  form the factual basis?

23          MR. MOORE:  We so stipulate, Your Honor.

24          THE COURT:  Thank you.  Based upon that stipulation

25  and the offense conduct as set forth in the presentence

report, the defendant's plea of guilty before the magistrate

judge, and the defendant's admissions in open court today, the

Court finds there is a factual basis for the entry of the plea

of guilty and enters a verdict and judgment of guilty in this

case.

Now, Mr. Fleming, your case was referred to the

United States Probation Office for the purpose of a

presentence investigation in the preparation of a presentence

report.  The Court has now received that report.  Have you

read that report?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  Have you gone over that report with your

attorney?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  Do you now believe you understand the

contents of that report?

THE DEFENDANT:  I do, Your Honor.

THE COURT:  All right.  Thank you.

Counsel, have you gone over that report with your

client, and do you believe he understands the contents of that

report?

MR. MOORE:  Yes, Your Honor.  We went over it at the

time the report was initially issued.  We went over it again

after the report was finalized, and we reviewed it again this

morning; he understands.

1      THE COURT:  All right.  Are there any objections to

2  the presentence report which remain outstanding today?

3      MR. MOORE:  There are no objections from the

4  defense, Your Honor.

5      THE COURT:  From the government?

6      MR. FENTON:  None, Your Honor.

7      THE COURT:  All right.  Thank you.

8      Then the Court will accept the information contained

9  in the presentence report for the purpose of applying the

10  guidelines.

11      It would appear in the instant case that the

12  guidelines provide for a total offense level of 20, a criminal

13  history category of I, and a guideline sentencing range of 33

14  to 41 months.

15      Does the defense agree that that is the advisory

16  guideline for this case?

17      MR. MOORE:  The defense agrees that that is the

18  advisory guideline for this case prior to any motion for

19  departure pursuant to 5K1.1, Your Honor.  Yes, we do.

20      THE COURT:  All right.  Does the government agree

21  that that is the guideline?

22      MR. FENTON:  Yes, Your Honor.

23      THE COURT:  All right.  Thank you.

24      Now, are there any motions for departures or

25  variances from the government?

1    MR. MOORE:  Yes, Your Honor.  Do you wish him to

2  remain standing?

3         THE COURT:  He can sit down at this point.

4         MR. MOORE:  Thank you.

5         THE COURT:  Thank you.  Yes, sir.

6         MR. FENTON:  Yes, Your Honor.  The government is

7  moving for a downward departure of about 50 percent, which

8  would put the sentencing guideline range at 15 to 21 months,

9  and the offense level at 14, in exchange for Mr. Fleming's

10  substantial assistance to the government.

11         THE COURT:  All right.  I will hear from the defense

12  on sentencing in the determination to the government's motion.

13  Go ahead.

14         MR. MOORE:  And if it's acceptable to Your Honor, I

15  will talk about the government's motion in the context of my

16  overall presentation.

17         I'm sure that as the Court is aware from my

18  sentencing memorandum I'm going to ask for a little bit more

19  than 50 percent based on his cooperation because I truly

20  believe he's been one of the most cooperative defendants that

21  I've ever encountered, both when I was a prosecutor for

22  23 years and certainly since I've been out in private practice

23  for the last six.

24         But, Mr. Fleming, who I will refer to as "Nick" is

25  66 years old.  He has three grown children.  And he and his

now ex-wife were divorced after he was charged in this case.
I will talk a little bit more about that situation later.

As I know Your Honor has seen from her letter, he
has a 91-year-old mother who lives in Minnesota, and he tries
to spend as much time with her as possible.

Since shortly after he was charged and arrested in
this case, Your Honor, he got a new job with "Stop IRS Debt"
as a customer service representative. He really likes his
job, and he's advanced in the company since he was hired.

And as noted in the letters written by Kirsten Payn
and Rebecca Argall, who were his supervisors at the company,
they are aware of his conviction here. They are aware of his
guilty plea, but they believe that he is a valued employee and
they would like him to continue to work with their company.

As they noted in their letter and as I have noted in
the sentencing memorandum, if Your Honor decides to sentence
him to a term of active incarceration he will lose that job,
and he will lose along with it some ability to make
restitution payments. He would have to reapply after being
released from incarceration. If he were to be rehired, he
would start at the bottom no longer going at the position he's
at.

As I noted, and Your Honor has read the government's
motion for cooperation, one of the things that has struck me
about this case is, you know, I was a prosecutor for a long

1  time.  And I didn't see a whole lot of people who were able to

2  do a whole lot of proactive cooperation after they got

3  charged, and after the fact that they were arrested it sort of

4  became known to folks.  I've been shocked at his ability to

5  record conversations with people who were the targets of

6  government investigations, and in one case record

7  conversations with a gentleman named CJ Cumo, who is currently

8  charged in the Northern District of Texas, and I will talk

9  about him in a few minutes.

10        You know, when Mr. Fleming made the decision to

11 cooperate.  I told him that it had to be all or nothing.  That

12 he was either all in and would tell the government everything

13 or that he just shouldn't go down that road.  And if he was

14 going to cooperate he had to do it 100 percent, and he jumped

15 in with both feet and he has done that.

16        He provided information about his co-defendants in

17 the Niyato case.  As the government said, he was the fourth

18 defendant in.  But he also testified in the trial that was

19 before Your Honor in January of last year.

20        And we were informed by the government that they

21 felt that he was one of their best witnesses because he called

22 it straight down the line.  He was one of their first

23 cooperators.  In fact, he was so helpful that at one point the

24 government thought about recalling him during their trial.

25        I know Your Honor had the ability to see him and

evaluate his truthfulness, but I am told by the government

that they were completely satisfied with his cooperation.

In addition to testifying in that trial, he has

participated in an investigation which has ultimately led to

the charging of Mr. Cumo and others in the Northern District

of Texas in connection with this Earthwater scheme which is

very similar to what happened in this case, Your Honor.

And he and his co-defendant fugitive Thomas Broyles

were directly involved in promoting and selling those

investments, and he provided substantial investigation about

it to the government.

He spent a lot of time on the phone with Inspector

Bodin, and he is also recorded on at least two separate

occasions meetings with CJ Cumo.

He facilitated approximately five to ten other

recorded conversations with the government and, at one point,

he even set up a mock investor meeting with the principal.

And he informed Mr. Cumo he met a potential investor at a yoga

studio and expressed he was interested in hearing the

Earthwater pitch, if you will, and he was able to record that

with Mr. Cumo.

So it is very, very likely that he will be one of

the government's primary witnesses in that case when it goes

to trial.

But the government has indicated to me -- when Your

1  Honor scheduled this sentencing -- I talked to the government

2  about potentially jointly moving for a delay in this

3  sentencing until after that trial.  The government did not

4  want to do that, and I will speak to that in a few minutes.

5          And -- but he has provided substantial assistance

6  which we believe helped led to the charging in this case.  His

7  cooperation didn't stop there.

8          There were defendants charged in the *United States*

9  *versus Andrew Tager, et al*, in the District of Utah.  He

10  traveled to Salt Lake City on his own dime to meet with

11  investigators there, and he was interviewed in connection with

12  that case.

13          There is another gentleman named Robert Welch who

14  has been involved in investment scams for sometime.  Mr. Welch

15  reached out to Mr. Fleming.  Mr. Fleming was able to recently

16  record conversations with Mr. Welch, and he had previously

17  recorded other conversations with Mr. Welch.  I don't know

18  what the government's current intentions are with respect to

19  Mr. Welch, but I am informed that he is someone who has been

20  of interest, at least to the government.

21          The government has, in this case, asked for a

22  50 percent reduction.  I'm told by the gentleman from the

23  prosecution table that 50 percent is the maximum that the

24  fraud division will recommend in a particular case.

25          Now, we didn't have rules like that when I was an

1  AUSA in the District of South Carolina.

2  THE COURT:  They have them here, though.  Over here

3  it's, if you give some help it's 25 percent, and something

4  else is 30 percent, then 40 percent.  We usually did go

5  50 percent when I was -- for extraordinary cooperation we

6  did -- we would do more.  But we usually did 50.

7  But they got it -- my feeling on it is if somebody

8  agrees to cooperate at 100 percent and they don't get called

9  because everyone pleads guilty, they shouldn't be getting less

10  off than the guy who has to go testify.  Now, if they have to

11  testify and don't do it all bets are off.

12  But the office here has a different way of looking

13  at it, and I take that into consideration and do what I think

14  I ought to do.

15  But more than 50 percent is unusual for me to give

16  off.

17  MR. MOORE:  And I've been told that, Judge.  You

18  know, it was unusual for me to recommend more than that when I

19  was an AUSA.  But truly substantial cooperation, I would

20  submit, deserves a truly substantial reward here.  And the

21  government is asking for a sentence within the 15 to 21 month

22  range.  If you gave him the bottom end of that range, 15

23  months, I'm asking Your Honor for a little bit better, and I'm

24  asking for it because of the fact that he has cooperated and

25  he has testified.

1          THE COURT:  How much prison time do you think he

2   ought to get?

3          MR. MOORE:  Well, I would like to see him get no

4   active prison time, Your Honor.  I understand that's a big

5   ask.  Okay.  I understand it's a big ask.  I think that a

6   substantial term of house incarceration would be appropriate

7   in this case and there is one point --

8          THE COURT:  But that's not really prison time.  I

9   mean, I heard somebody once say that they had to be

10  incarcerated at home and would go to work and had to be home

11  at night.  And I said, "I'm under that sentence."

12         MR. MOORE:  Well, with Mr. Fleming, you know,

13  Mr. Fleming has something of an unusual situation with his now

14  ex-wife who chose to divorce him after she found out about

15  this case and then decided to allow him to live in the room.

16         The reason she decided to divorce him was because

17  they have always been interested in fostering, and then she

18  had a dream of perhaps adopting some children.  And she was

19  concerned and told that she couldn't adopt children with a

20  husband who is a felon.  She has since been told through

21  talking to people at another agency -- and so they divorced.

22  But she let him live at home.  Okay.

23         And she wrote a letter to Your Honor, which, you

24  know, is one of the most honest letters I think I've read,

25  because, obviously, I didn't have any role in drafting it,

1  where she talks about their relationship and in the fact that

2  in the two years since she made the decision to divorce him

3  they have a really good relationship at this point.

4          And that she has talked to a new foster agency who

5  has agreed that if he doesn't have certain convictions, which

6  he does not have, that there is a possibility that they would

7  consider placing a foster child in that home.  She sort of

8  been told, although it is not official, that if he gets no

9  jail time it's a better chance.

10         But, you know, his situation at home is different

11  than perhaps other situations.  Maybe it's better or worse

12  that you're living with your ex-wife who you are no longer

13  married to.  I don't know.

14         But in any event, one thing that is not mentioned in

15  the government's 5K motion, and I mentioned it briefly in my

16  memorandum because I think this is something I would

17  respectfully request that Your Honor take into consideration.

18         As I told you -- when I told him he had to

19  cooperate, I told him he had to do -- to not hold anything

20  back.  There's a good friend of his who sold stocks with him

21  named Scott Dearborn.  And Mr. Fleming likes Scott Dearborn,

22  felt sorry for him because he knew he didn't have the best

23  life and didn't really want to cooperate against him.  But I

24  told him if you're going to cooperate you got to tell them

25  everything.  So he did.

1          And his cooperation is what apparently, obviously,

2    made the government believe it had a sufficient case to charge

3    him.  So they charged Mr. Dearborn in a superseding

4    indictment.

5          Mr. Dearborn chose to take his own life; very

6    unfortunate decision.

7          Mr. Fleming was very upset about that, as one might

8    imagine.  I have told him many times that people don't take

9    their own life just because they get charged in a case.  He

10   obviously had a lot of other issues going on.  But that has

11   plagued him and weighed on him and it is something that will

12   bother him probably for the rest of his life.  He did what he

13   agreed to do and he hasn't looked back.

14         So I would ask Your Honor to consider that when Your

15   Honor decides the appropriate sentence to impose.

16         You know, at least in some districts and I think

17   it's a practice in this district, sometimes you will give a

18   defendant a 5K and a Rule 35.  With the government's promise

19   and request for a 50 percent reduction in this case, I believe

20   the government thinks that it no longer has any obligation to

21   reward Mr. Fleming with a Rule 35 if you sentenced him to

22   imprisonment, and he has to go testify in the Earthwater case.

23         I would ask you to consider the fact that he has

24   cooperated in that case and given Your Honor's own stated

25   views on the facts that, you know, you don't penalize people

1  who don't get called to testify at a trial because the other

2  people pled, he recorded conversations with the lead defendant

3  in that case.  Okay.  He has been cooperative.  He's provided

4  substantial assistance in that case now before he ever --

5  before he would ever set foot in a courtroom.

6          And so I would ask Your Honor to consider rewarding

7  him for his cooperation in that case when Your Honor

8  sentences -- his full cooperation in that case when you

9  sentence him today.

10         I also, if Your Honor -- I also want to talk a few

11  minutes about the 3553(a) factors if Your Honor will permit me

12  a few minutes.

13         He is 66 years old.  Okay.  First time he's ever

14  been in court, never imagined he would be in front of court

15  being sentenced by a judge like Your Honor.  But at 66 he is

16  less likely to recidivate based on all these studies that have

17  been done, and we reference those in our sentencing

18  memorandum.

19         He is a good person, okay, despite the fact that

20  he's made mistakes.

21         If you read the letters that have been written by

22  his family in one of the letters that sort of struck me is his

23  80-year-old neighbor who talked about what a good person he

24  is, and how he goes over and tends to her and helps her do

25  things like put up Christmas lights.  That's the sign of

1    somebody who's a pretty good person, in my view, I would
2    submit.
3           So when we talk about the history and
4    characteristics of the offender, I think that is something
5    that I would ask Your Honor to consider.
6           I talk about job, because he has a good job now.  If
7    you sentence him to jail he will lose it.  There is a
8    possibility, I'm just speaking frankly, that he would get it
9    back.  He will be making a whole lot less money, okay, and
10   that is going to make his ability to make restitution payments
11   harder for him.
12          He also was -- I know that the presentence report
13   talks about his problems with his prostate.  Since the
14   presentence report was written, they actually discovered that
15   he had cancer.  He had surgery.  He is doing much better.  He
16   appears to be cancer free, but it's fairly early in the
17   process.
18          And if Your Honor will permit me, give me one
19   moment, I do have a letter from his doctor which I would ask
20   to be allowed to hand up and give the government.  I did not
21   have the letter at the time we filed the sentencing memorandum
22   or I would have included it.
23          May I approach, Your Honor?
24          THE COURT:  Yes, sir.  Yes, sir.
25          MR. MOORE:  He still has residual issues, still

1  undergoing testing and treatment. If Your Honor chooses to
2  sentence him to a sentence of incarceration, which I would ask
3  Your Honor not to do, I would ask Your Honor to delay his
4  reporting a little bit so that he has an opportunity to make
5  sure that his incontinence and other issues are under control
6  before he goes to the BOP.

7       But he has a need for ongoing medical treatment and
8  the cancer could reoccur.

9       He's also been told because he has Medicare Part B
10 that he needs to try to continue to make those payments even
11 if he goes to jail. And so if Your Honor sentences him to a
12 term of incarceration, again, one of the reasons why I will
13 ask you to defer reporting is to give him some time to save up
14 some money and make some sort of substantial lump sum payment
15 before he goes away.

16      And again, I have talked about his familial
17 situation.

18      Right now if Your Honor were to give -- the
19 government is recommending a reduction of four levels --
20 excuse me -- six levels. If you gave him a reduction of nine
21 based solely on his cooperation and not based on any variance
22 or the 3553(a) factors that would put him in Zone B, which
23 would make him eligible for a probation with conditions of
24 confinement sentence.

25      If you gave him a reduction of eight levels that

1  would put him in Zone C which would be a split sentence, you

2  know, half time -- if Your Honor was amenable to this, half

3  time in the BOP, half time on home confinement.

4      But based on his cooperation, and the unique

5  circumstances of his offense, and him, and the fact that it

6  will be very challenging for someone who is 66 or perhaps 67,

7  at that point, with a felony conviction to get another job.  I

8  would ask Your Honor to consider imposing a sentence of

9  probation with conditions of confinement for whatever time and

10 of whatever duration that Your Honor chooses.

11     I understand that there is a sentence in the

12 presentence report about the fact that because his guideline

13 range is in Zone D that he's not eligible for probation.  Of

14 course, if Your Honor departs nine levels we no longer have

15 that issue.

16     In addition, I have always taken the position that

17 those are guideline provisions which are now advisory only.

18     And finally, I've also seen other judges get

19 creative by saying, okay, well, if I have to give someone jail

20 then I will sentence him to a term of time served.  He spent a

21 day in jail when he was arrested in California and then put

22 him on supervised release thereafter.

23     THE COURT:  I'm not a really very creative person.

24     MR. MOORE:  It's something that I liked when I saw

25 it.  And I perhaps liked it a whole lot better as a defense

1    lawyer than I did as an AUSA.

2            THE COURT:  I had that same thing happen to me too.

3            MR. MOORE:  Yes, sir.  But so -- and I will have a

4    couple of concluding remarks, and we can certainly answer any

5    questions.  But at this point I would like to let you hear

6    from Mr. Fleming if you would permit him a few minutes to

7    speak to Your Honor.

8            THE COURT:  Yes, sir.

9            THE DEFENDANT:  Good afternoon, Your Honor.

10           THE COURT:  Yes, sir.  Good afternoon.

11           THE DEFENDANT:  I'd first like to apologize to you

12   and to the Court for even standing before you today.  In my

13   66 years I never thought I'd be in this position.  I

14   understand what I did was wrong, and I am truly sorry to the

15   innocent people that were harmed because of my laziness, my

16   greed to make an easy buck and without regard to the ultimate

17   consequences to those people.

18           There was a time I was involved in the securities

19   industry and marketing investments in an appropriate manner

20   adhering to all the licensing and reporting requirements.  I

21   made an okay living as a salesman and a supervisor with

22   administrative duties able to support my wife and young

23   children.  However, after a period of time I left that

24   industry and went in another direction.

25           I got a real estate license to work with major

developers marketing timeshares for about 10 years, and after

that eventually I was recruited once again to be involved in

selling investments but this time I'd not be personally

selling.  With my skill set, they wanted me to manage and

administer a marketing office raising money for a private

company with the intention of taking them public.

After doing that for about two years the opportunity

ran out and I found myself looking for something else to do.

As my attorney's shared with you, a salesman and

friend of mine Scott Dearborn asked if I could find another

project for him to sell.  He said he would give me an override

percentage on his sales just for bringing him a product and

administering any of the paperwork.  So I did that.

Unfortunately the project I brought to him was

Niyato.  That came to my attention from an old acquaintance

named Daniel Broyles, my fugitive co-defendant in this case.

I set up the marketing logistics and Scott sold

Niyato to about ten investors, of which I got an overriding

commission on his efforts.

And although I was aware of the commission structure

on that Niyato project was excessive and undisclosed in the

offering documents I chose to look the other way and let Scott

make those sales.

I suppose I was hoping based on the fact that

Broyles told me Stencil was advised by a lawyer in setting up

1  the prospectus that there was a chance that the net amount of

2  money received by Niyato would be sufficient enough to

3  implement a business plan and everyone could make some money.

4          We all know now that there was never a chance for

5  success, as has been proven.  The principal of Niyato was

6  simply using the funds for personal gains, something that I

7  should have realized upfront.

8          After I agreed to cooperate and give any information

9  to any name that was -- I knew that was involved, Scott also

10  got indicted and became extremely depressed and took his life

11  at that time.

12          Scott's decision to make -- to take his life is

13  something that will haunt me for the rest of my life.  I think

14  about him every day.

15          Looking back over my involvement in Niyato, it was

16  clear that although I was selling investors, I was involved --

17  I wasn't selling investors I was involved in.  I'm guilty of

18  ignoring clear signals of fraud in that Niyato offering.

19  Consequently, I stand before you today for judgment.

20          I can only plead for mercy at this point.  I've

21  been, as my attorney shared with you, battling prostate cancer

22  for ten months and had my prostrate removed in late March, but

23  I'm not out of the woods yet, continuing testing for at least

24  a year.

25          Besides my health issues, I have a mother that is

turning 91 next month. She's in frail condition and I'm hoping to spend as much time with her as possible before she passes.

My attorney has also explained my family situation to you, and it is my hope that my now ex-wife and I can continue to repair our relationship and eventually foster or adopt a child.

Your Honor, I've tried to cooperate to the fullest extent in an effort to right the wrongs that I've caused. I apologize to the Court, to investors, to my family, and my friends for my action.

I ask that you consider my cooperation, my family situation, my age, my health, and my need to continue to try to earn an honest living when you sentence me today.

I am truly sorry and remorseful for the choices that I've made and caused people financial and emotional harm. I can truly say that I will never be involved in something criminal again for the rest of my life.

I appreciate the opportunity to speak today and beg you for leniency.

Thank you, Your Honor.

THE COURT: Thank you.

Let me hear from the government.

MR. FENTON: Thank you, Your Honor.

The government agrees that Mr. Fleming's cooperation

1  has been truly substantial, and the government also believes

2  that that is reflected in its request for a 50 percent

3  downward departure.

4          THE COURT:  Are you making similar requests on the

5  remaining defendants on here today?  In other words, what are

6  your recommendations on those?  I mean, I've got them here.

7          MR. FENTON:  On the two other defendants who are

8  being sentenced today?

9          THE COURT:  Yes.

10          MR. FENTON:  It would be the same, Your Honor.

11          THE COURT:  The same?

12          MR. FENTON:  Yes.

13          THE COURT:  Is the level of cooperation the same?

14          MR. FENTON:  Yes.  Yes, Your Honor.

15          Mr. Fleming has done some things that are arguably

16  different but -- and let me just cover those here.

17          So Mr. Fleming pled guilty and began cooperating

18  within six months of the indictment.  He provided information

19  regarding Niyato that led to the indictment of another

20  defendant, Mr. Dearborn, which Mr. Moore covered which was

21  unique.  He also testified at trial against the Stencils and

22  Mr. Duke.  He brought to the government's attention and

23  provided information about a then active high-yield investment

24  fraud that was being run out of Dallas, Texas, which has since

25  been indicted.  There are six defendants in that case who have

been indicted to date.  Mr. Fleming provided -- he was
debriefed on multiple occasions.  He provided documentation
and, as Mr. Moore covered, he also provided proactive
assistance meeting with targets and also recording the calls,
and the government believes that that cooperation was truly
substantial and that for that he should get a 50 percent
reduction.

Nevertheless, the government still believes that
confinement, not probation, is appropriate under these
circumstances for a number of reasons.

The first being the nature and circumstances of the
crimes.  These high-yield investment frauds are serious.  They
are serious crimes.  The goal here is to find people and take
as much money -- take as much of their money as they can.
There's no question of risk here.  There's no question about
the possibility that the investment may or may not turn out
because there's a high risk of success.  These frauds are
total scams from the start.

Here Mr. Fleming lied about how the proceeds were
being used.  He knew from the start that 50 percent of the
money was going to go into his pocket and his co-conspirators'
pockets.  That was something that he knew out of the gate.  So
he knew this was a scam.  There was no chance of success, zero
chance of success.  And when a victim was defrauded and
invested their money, what would happen is Mr. Fleming and his

1    co-conspirators would then go back to those victims and ask

2    them for more money.  That was something that was common in

3    this scheme and other schemes that we've seen as well.

4           Mr. Fleming testified at trial about other schemes

5    that he had been involved in around the same time, and we

6    talked about some of these schemes; Green Automotive was one

7    of the schemes, New Global -- New Global Energy, and some of

8    the other people.  The co-conspirators who were also involved

9    in those schemes.  This crew of individuals including Broyles

10   who is the fugitive defendant, and also Scott Dearborn who was

11   indicted but then took his life.

12          And Mr. Fleming also recruited people into the

13   scheme.  He was recruited and he recruited someone else as

14   well.  So those are things to take into consideration with

15   respect to the question of confinement versus probation when

16   you look at the nature and circumstances of the crime.

17          Another important factor here is the need to deter

18   these high-yield investment frauds.  There is a low barrier to

19   entry.  It basically requires a telephone and an email

20   account, which at least with respect to the email account is

21   free.

22          It's also easy to conceal your identity from your

23   victims which makes it easier to perpetrate these crimes.

24   It's fast money, as Mr. Fleming said, and the amount of money

25   that you stand to gain can be quite significant.  You have a

50 percent commission and you get somebody to invest $5,000, you walk away with $2,500, which is a lot of money to a lot of people in this country. You get thousands of dollars in commission.

So it's very important to deter other people also from committing these types of crimes. And regulatory -- giving probation would essentially be equivalent in the government's eyes to a regulatory violation or something of that nature, which as Mr. Fleming said and testified at trial, he had violated regulations and a regulatory agency had taken actions against him. But that didn't deter him from committing that crime and it doesn't deter other people as well.

So it is important that people understand that doing this, picking up the phone and calling someone that they can't see them and that can't see them and asking for thousands of dollars under false pretenses is a real crime and that can lead to real jail time.

With respect to the reasons why Mr. Fleming is asking for probation, there are primarily three.

One, is that it may increase the likelihood that his ex-wife will be able to adopt in the future, that he needs to monitor his ongoing health issues, and also that he currently has a good job.

The impact, if any, of imprisonment on these is

1    speculative in many respects.

2              And also I think it's important to keep in mind that
3    the amount of time that the government is asking for in this
4    particular case is not a long amount of time.  It's 15 months,
5    possibly 21 months at the most.  We're talking about under
6    two years.

7              It's also important I think for the Court to
8    consider that Mr. Fleming can continue to monitor his health
9    when he is confined because the Bureau of Prisons has the
10   ability to continue to do that.  Defense counsel has offered
11   no reason why that would not be the case or why that would be
12   unsatisfactory with respect to Mr. Fleming's health.

13             The last point I'll just address is the employment.
14   The government understands why Mr. Fleming would want to keep
15   his job.  I think that the letter, the very nice letter that
16   was written by his current employer leaves open the
17   possibility that he can return to that job even after he
18   serves a prison term, though, as they say in the letter, it is
19   not something that they can necessarily guarantee.  But that's
20   what we're talking about here, really, is whether or not they
21   can guarantee it.  And there are lots of things in life that
22   are not guaranteed.

23             But nevertheless it is important that a sentence be
24   imposed that includes prison time so that people understand
25   that this crime, which is easy to perpetrate, should not be

1    committed.  That other people should not be victimized.

2               Thank you, Your Honor.

3               MR. MOORE:  Can I briefly respond, Your Honor?

4               THE COURT:  Yes, sir.

5               MR. MOORE:  The offense itself, Mr. Fleming didn't

6    set out to just willy-nilly defraud people.  He wasn't the

7    Stencils who set up the scheme.  Okay.  He did look the other

8    way when he gets the prospectus that says that "X amount of

9    money is going to be paid in commissions."  He knows enough to

10   know that something is up.  Okay.  But he's not someone who

11   just set out willy-nilly to defraud people and take their

12   money.  Other defendants in this case did, but I think it is

13   important to draw distinction between those folks.

14               Just because you're a participant in a high-yield

15   investment fraud scheme does not, I submit, mean that you

16   should go to jail just because you are a participant,

17   particularly if you cooperate to the degree that Mr. Fleming

18   did.

19               I did not hear the prosecutor tell you that there's

20   a possibility of a Rule 35.  They did not address that at all.

21   I think that the absence of that statement speaks volumes.  I

22   think that they do not intend to do anything else for

23   Mr. Fleming after Your Honor sentences him.

24               Of course he will cooperate, and he will testify in

25   that case, but I don't see that he has much of a realistic

1   chance of reward.

2           When you hear the statements about deterrence, I

3   guess there's general deterrence and there's specific

4   deterrence.  He doesn't need any other deterrence because he

5   has been deterred.  He will never do this again.

6           I made similar arguments about, you know, general

7   deterrence when I was a prosecutor.  I don't know that the

8   fact -- putting Mr. Fleming in jail for 12 to 15 months is

9   going to make somebody decide not to insinuate or involve

10  themselves in this type of investment fraud any more than

11  probation with conditions of confinement and a chunk of a

12  $1.4 million restitution payment is going to defer those

13  folks.

14          THE COURT:  Yeah, but the restitution payment, I

15  mean, that's pie in the sky.  That will be -- I would hate to

16  be sitting around waiting for my restitution to come.

17          MR. MOORE:  And I understand that, Judge.  I mean,

18  you know, luckily there are other defendants in this case who

19  I hope have more money than he does because he doesn't have

20  much.

21          My point is that the government often says, "Well

22  you have to send somebody to jail because there's a need to

23  deter."  I don't know that folks out there in the community

24  who are deciding to, you know, commit these crimes get

25  deterred by it.  I mean, drug dealers get jail time every day

1  and there are, you know, you take five of them and there are

2  ten more waiting to take their place on the street corner.  So

3  I just feel like I need to say that.

4          And I also feel like I need to point out that while

5  the restitution figure is substantial here, he personally made

6  about $30,000.  That's what he made as a result of this,

7  unlike some of the other defendants in this case.

8          So I'm simply asking Your Honor to look at him

9  individually and not just him as part of a collective.

10          I understand that Mr. Swerdlen and Ms. Saccamanno

11 also cooperated substantially.

12          I know that the only other defendant who has been

13 sentenced so far in this case is Mr. Sharp, but he's in a

14 completely different place than they are because he pled

15 guilty to another offense which had a $10 million fraud amount

16 and got much more time.  But it was because the guidelines for

17 that offense drove his range, not because he got 102 months

18 for participation in Niyato.

19          I would ask Your Honor to take all those facts into

20 account.  I would respectfully submit that a sentence of 15

21 months or more is more than sufficient and greater than

22 necessary to provide just punishment for this offense.

23          And if Your Honor is considering active

24 incarceration, I would ask Your Honor to consider a sentence

25 of perhaps six months in jail and six months on home

1  confinement or 12 months and a day.  I would ask Your Honor to

2  consider that to reward him substantially for all his

3  cooperation and to look at him as an individual.

4        THE COURT:  Okay.

5        MR. MOORE:  I'm happy to answer any questions if

6  Your Honor has any.

7        THE COURT:  No.  No.  I think general deterrence is

8  the thing that's running what the Court's going to do.  Most

9  of these folks, like your client, are probably deterred not

10 because of age.  Because people can be pretty wild for a long,

11 long time.  I had somebody come in and there was a fella in

12 here, I think he was 60 years old, and he said he was elderly.

13 The lawyer argued that he was elderly.

14       MR. MOORE:  I just turned 57 so I'm never going to

15 make that argument because I don't think people that age are

16 elderly.

17       THE COURT:  There are people who will make that

18 argument.  I am not moved by that argument.

19       MR. MOORE:  Understood, Your Honor.

20       THE COURT:  But general deterrence is the real

21 problem with a crime like this, mitigated substantially by the

22 fact that he cooperated because you want people to cooperate.

23       We've got three people to sentence.  Your arguments

24 will be the same on all three of these; 15 to 21 months?

25       MR. BOWNE:  Yes, Your Honor.

1          THE COURT:  Is there any difference in that?  I

2   mean, this defendant is arguing that he cooperated in Texas.

3   Is this it for him?

4          MR. FENTON:  Is this --

5          THE COURT:  Will there be a Rule 35 after his --

6          MR. FENTON:  No, Your Honor.  Mr. Moore is correct.

7   The government does not anticipate filing a Rule 35 motion.

8   We think that the 50 percent that we are moving for is

9   significant, that it reflects his cooperation to date,

10  including what he would do if he were to testify at trial.

11         THE COURT:  Yes, and I understand.  I understand

12  that argument.  I mean, it's when you've got somebody that's

13  looking at 20 years and you give them 50 percent off, you've

14  given them 10 years off.  On this you're giving him about,

15  let's see, what's it 33 down to 15 would be about 18 -- about

16  a year and a half off.

17         MR. FENTON:  Right.

18         THE COURT:  It's when you get down in the lower

19  areas the Court's got -- it's a little more difficult to deal

20  with all of those issues about that.

21         MR. FENTON:  Right, but I think --

22         THE COURT:  I agree with you on the fact that there

23  needs to be some jail time on these.  That's the problem that

24  the Court has in terms of deterrence, general deterrence.  To

25  sit around and say, "Go on home and go about your business" is

1  just -- it's very difficult for the Court to do that.  We do

2  have good medical care in the federal prison systems, not

3  necessarily here in the Mecklenburg County Jail.  They do the

4  best they can.  But they're not equipped to deal with real

5  serious medical issues.

6       MR. FENTON:  Your Honor, I just want to add one more

7  thing before Mr. Moore speaks, which is that by giving the 50

8  percent now we're giving that upfront.

9       THE COURT:  You're giving what now?

10       MR. FENTON:  We're giving the 50 percent upfront.

11  If we're expecting Mr. Fleming will still testify --

12       THE COURT:  Right.  But if you --

13       MR. FENTON:  -- he doesn't have to wait to get that

14  additional time off.  So we're not moving for 40 percent --

15       THE COURT:  Right.  But if you put him up there and

16  he doesn't, I mean, you know, you can --

17       MR. FENTON:  Right.

18       THE COURT:  -- he would be in violation of his plea

19  agreement.  If you got any other crimes out there -- I mean,

20  he has to follow his plea agreements in these cases.  He has a

21  contract with the government, part of it is that limits his

22  exposure, limits the charges, limits things.  I mean, it's not

23  just prison time that he waits on.  He's got to do it.  If he

24  doesn't do it, he's got a problem.  So I do understand you're

25  counting on him to do that.

1          MR. FENTON:  Right.

2          THE COURT:  And I seriously doubt he would take the

3    stand and perjure himself after this because that would be

4    some real time and it's very, very difficult to cooperate

5    against your own perjury.

6          MR. MOORE:  I would say, Your Honor, he's going to

7    cooperate.  He is going to testify because he signed the deal,

8    and he's going to comply with it because that's what he agreed

9    to do.  I simply make the point --

10         THE COURT:  There's usually a stick there to.

11         MR. MOORE:  I know there's a stick.  There's no more

12   carrot but the stick is still there.  I got that.  I've

13   explained that to him.  Although I didn't really need to

14   explain it, but I thought I should.

15         My point is that foreclosing a Rule 35 for someone

16   who you know is -- because they know that Mr. Cumo is almost

17   certainly going to trial.  They've told me that.  They believe

18   he's the one going to trial.  They know that they will be

19   calling Mr. Fleming because they know that he recorded

20   conversations.

21         THE COURT:  But what they've done is, they have a

22   policy that they're not going to go below 50 percent.  So they

23   are giving him everything they can give him because that's

24   their policy.  People have policies.  They follow policies.

25   That's their business.  Sentencing is my business.  But that

1    is their policy, and they've got that, and they are following

2    that.  And I don't blame them for doing that.

3            I'm trying to see what -- I've got two more

4    sentences to do after this.

5            MR. MOORE:  Yes, sir.

6            THE COURT:  I'm trying to parse this thing out

7    between the three individuals.  We've got one person who is --

8    may not have been able to cooperate quite as much as your

9    client, but he's sicker.  Then we've got a lady in this thing

10   who has been taking care of sick people.  So I got all those

11   kinds of issues.  It happens in about every case I get where

12   the people have done anything good I get to hear about all of

13   them.

14           Now I got to try to figure out between all of

15   this -- everybody's well represented in these cases which is

16   not always the case but in fraud cases we usually get the best

17   lawyers because there is usually a little bit of cash there.

18           MR. MOORE:  In this case it was garnered by his

19   family members coming together with the funds to hire me.

20           THE COURT:  That happens sometimes.

21           MR. MOORE:  Yes, sir.  But as I understand Your

22   Honor's point, I mean, they do have a policy and they have to

23   follow it.

24           THE COURT:  Right.  That's all they're saying.

25   They're not trying to be -- they're being upfront and honest

1    about it.  They've gone as far as DOJ will let them.  The U.S.

2    Attorney's Office here has a policy now.

3                MR. MOORE:  Yes, sir.

4                THE COURT:  When I was there it was, you can only

5    give what you can give.  If you're the mule, you can only give

6    up what you know, 100 percent.  If you're the king pin and you

7    flip on people, oh, you love it.  I was there.  You probably

8    were there.

9                MR. MOORE:  I was --

10               THE COURT:  Most guys flip and you can take down the

11   whole thing.  But you can't treat this guy differently just

12   because he didn't know it because he wasn't as involved.

13               MR. MOORE:  Yes, sir.

14               THE COURT:  So it's 50 percent for full cooperation

15   and it better be full.  And occasionally where somebody

16   endangered themselves by wearing a wire and going into the

17   organization and doing things that it was -- they could earn

18   something better.  But, so everybody's got a policy.  We had a

19   policy.  It was just ours was a little bit easier on that.  I

20   remember we were like the top five in the nation in drug

21   convictions and Atlanta called and wanted to know what we were

22   doing.  And we told them we were giving 50 percent off.

23               They said, "We only give three levels."

24               I said, "Well, that means they can go to prison and

25   be a hero for 20 years or ghosts for 17 years and be a zero.

1    Try giving them 10 years off on that and they'll give up

2    Mama."

3              MR. MOORE:  That's true, Judge.  My only argument

4    is -- and I'm not faulting the government.  They're doing what

5    their policy suggests.  I'm simply arguing that as Your Honor

6    noticed --

7              THE COURT:  I know.

8              MR. MOORE:  -- you're the one who makes the decision

9    on sentencing --

10             THE COURT:  I know.  I got three cooperating

11   witnesses, all who have different reasons, different 3553(a)

12   factors as to why they want to not go to jail.

13             The problem I've got is general deterrence.

14             MR. MOORE:  Yes, sir.

15             THE COURT:  I've got a serious general deterrence

16   problem here.

17             MR. MOORE:  And my only position is that fifteen

18   months is not going to deter anyone any more than 12 months

19   and a day or six and six --

20             THE COURT:  But I do think prison time sometimes

21   does individually, sometimes it doesn't.  I mean, there are a

22   whole lot of people for millions of dollars that would go to

23   jail for a few years and get three hots and a cot and then

24   come out and take the money if they knew they could get that.

25             MR. MOORE:  Right.  No, Your Honor is absolutely

1   correct.  I understand Your Honor's position about some

2   incarceration.  I'm just asking Your Honor to give him as

3   little time as possible if that's what Your Honor

4   determines --

5               THE COURT:  All right.

6               MR. MOORE:  -- is the appropriate thing under the

7   factors.

8               THE COURT:  Well, it's very difficult.

9               MR. MOORE:  Yes, sir.

10              THE COURT:  Because there's really not enough

11  time -- 15 months is not a huge deterrent as you have pointed

12  out.  And below that is, you know, is going to be -- sending

13  him home is not any deterrent at all.  I mean it would be, it

14  may be to him but for most people, most criminals it's not.

15              Many of my defense clients, the main question was,

16  "How much time am I gonna get?"

17              They would have pled to anything if it got -- for

18  less time.  I mean, if they robbed -- if they had stolen some

19  money they would plead to murder if they got less time for

20  murder.  They just wanted -- it was time -- not want to go to

21  jail.

22              MR. MOORE:  Yes, sir.

23              THE COURT:  So.

24              MR. MOORE:  Well, is there anything else I can tell

25  Your Honor?

1          THE COURT:  No.  I think I know everything.

2          MR. MOORE:  Thank you, Judge.

3          THE COURT:  I think I know everything.

4          I tell you what I'm going to do here.  I'm going to

5    go ahead and take a break here because this sentence is going

6    to implicate the other sentences, recognizing that there are

7    individual factors, the difference between zero and 15 months

8    is -- the Court is going to be giving so probably closing in

9    on similar type sentences in these cases.  I've read

10   everything.  I understand, I've seen a -- of this -- I've

11   read -- I did the CD in the next case.  I've seen that.  I

12   know you've got one individual that is pretty ill, but I don't

13   know, I guess they can give him all the medicines he needs in

14   the federal prison.  If they can, then there needs to be some

15   prison time involved.

16          So let me just take -- I'm going to take a brief

17   recess.

18          (Recess at 2:52 until 3:03.)

19          THE COURT:  Okay.  If you would stand up, sir.

20          Anything further from the defense before sentencing?

21          MR. MOORE:  No, sir, Your Honor.  I appreciate your

22   time and attention to this matter.

23          THE COURT:  Okay.  Well, I've -- there's been a lot

24   of material been given to me, both in your matter and in

25   Mr. Swerdlen's matter, and in Ms. Saccamanno's matter.  And

1  I've heard these folks testify, I know their testimony was
2  strong and certainly the jury convicted the two most culpable
3  of the ones they tried in the thing.  I think it was a good
4  trial.  I think I could see why the jury turned the wife lose.
5  But I thought it was well tried.

6          It's very, very difficult.  Looking at the 3553(a)
7  factors you have to provide respect for the law, provide just
8  punishment for the crime.  You have to protect the public from
9  further crimes of this defendant, as well as deter others who
10 might think this is a good idea.

11         And anytime money is involved, somebody is going to
12 think it's a good idea.

13         You want to avoid unwarranted sentencing disparity.
14 And you want to take into consideration the individual aspects
15 of each defendant.  And one of the things about having good
16 lawyers in each of these cases is that you're able to -- you
17 all are able to maximize at least those individual
18 characteristics which allow for some mitigation.

19         The big thing here is these defendants cooperated
20 and your client cooperated.  That's the biggest part of this
21 whole thing because without that it is very difficult for the
22 government to catch everybody that's involved.  I do think
23 that there are too many -- I wish there was more involvement
24 in catching people out there.  But as long as we have
25 politicized agencies in the United States we will always have

difficulties in getting all the wrongs righted that are out
there.  Every time there's an election we get a new head of
some agency and they come up with some new ideas of who to
help and who to hurt.

In looking at this case, these cases have got to
be -- have got to be prosecuted.  These guys are doing that on
a regular basis, and I commend what they're doing.

Today, I have individuals who start out with rather
low guidelines.  I know some people might not think 33 to 41
is low, but they're pretty low in what I see.

I think I gave 180 months earlier today to somebody;
that's some real time.

But they did cooperate.  It makes it difficult.  And
I know they're doing their jobs.  And I agree generally that
50 percent is where it really ought to go.  But in these cases
it's hard for me to determine -- your client obviously has
cooperated and had an opportunity to cooperate more than they
had because he was aware of another fraud.  So there's a
little bit of a double edged sword there.

But I think most of these folks are similarly
situated in this matter.

All right.  The Court is going to grant the 5K1.1
motion of the government.  It requires that the Court give
strong consideration with regard to the government's valuation
of the truthfulness, which it was truthful, the level of

1 assistance, which was substantial and sometimes extraordinary,

2 and its helpful nature and all of those things that the

3 government -- the government's in a better position than the

4 Court to know what was done, and the Court does that.

5 Then it is up to the Court to exercise its

6 independent judgment on what is the appropriate sentence in

7 the case.

8 So after some thought, some of it coming today,

9 although it was -- the Court had considered the possibility of

10 some reduction before today -- the Court is going to depart

11 for the full cooperation and truthful and Court-observed

12 cooperation of this defendant to level 12, which is a Zone C

13 sentence of 10 to 16. I'll sentence there as follows:

14 The Defendant Nicholas Fleming is hereby committed

15 to the custody of the United States Bureau of Prisons to be in

16 prison for a term of five months on each of Counts One and

17 Nineteen to be served concurrently.

18 I'm going to put the rest of this in supervised

19 release. Is that what I do? Or do I do that --

20 PROBATION OFFICER: Yes, sir.

21 THE COURT: Okay. The Court -- I'll just give you a

22 heads up. The Court is going to give ten months of home

23 confinement to make up the 15 months, which is the bottom end

24 of the guideline that the government had in this case. The

25 Court agrees that there needs to be a sentence there, and

1    there needs to be imprisonment, but I'm doing it in this way.

2            The Court recommends the Bureau of Prisons designate

3    a facility as close to Los Angeles, California, for service of

4    this sentence.

5            The Court further recommends the defendant be

6    allowed to participate in any educational or vocational

7    opportunities while incarcerated.

8            You're not going to have a lot of that because

9    you're only going to be there for five months wherever they

10   send you.

11           Upon release from imprisonment the defendant shall

12   be placed on supervised release for a term of 2 years.

13           This term consists of 2 years on each of Counts One

14   and Nineteen, all of these terms to run concurrently.

15           Within 72 hours of release from the custody of the

16   Bureau of Prisons the defendant shall report in person to the

17   probation office in the district to which the defendant is

18   released.

19           While on supervised release the defendant shall not

20   commit another federal, state or local crime, and shall comply

21   with the standard conditions of supervised release that have

22   been adopted by the Court in the Western District of North

23   Carolina and shall comply with the following additional

24   conditions:

25           The defendant shall not -- now, what type of

1  business is he in again?

2       MR. MOORE:  Your Honor, he works as a marketing

3  representative for a tax company.  They take in calls and they

4  try to work with the IRS to reduce someone's tax debt.

5       THE COURT:  But is any part of this telemarketing at

6  all?

7       MR. MOORE:  Beg a moment.

8       (Pause.)

9       He doesn't engage in what I would call

10  "telemarketing."  The company markets it, and he is one of the

11  people who gets the phone call.

12       THE COURT:  Is this one where they -- like they

13  advertise on TV that they can reduce your taxes?

14       MR. MOORE:  Yes, sir.  That's what it is.

15       THE COURT:  Yeah.  If they really can do it,

16  everybody ought to call them.  I don't know if they can always

17  do it.  Although taxes are necessary.  The government runs on

18  taxes and the tooth fairy.  If the tooth fairy is not pulling

19  the weight, the taxes have got to do it.  Nothing else, no

20  other way to do it.  You can call it something else.  You can

21  call it a surcharge, anything you want to do.  It's taxes.  We

22  got to have them.

23       The defendant shall not engage in an occupation,

24  business profession or volunteer activity that requires or

25  enables the defendant to participate himself in telemarketing

1    without prior approval of the probation office.

2            That will take care if somebody else has to do that.

3    If he's just trying to help on the tax stuff.

4            My guess is if he's good at it they will hire him

5    back after five months.  They might even hold the job for five

6    months for him, but they may not.  If they don't, that's just

7    part of what happens.  I can't let everybody with a good job

8    not go to jail.

9            Periodic drug testing mandated by the Violent Crime

10   Control and Law Enforcement Act of 1994 is hereby suspended.

11   The Court finds this offense is not drug related and the

12   defendant has no current or past history of substance abuse.

13           It is ordered the defendant shall pay the United

14   States a special assessment of $200.

15           It is further ordered, having determined the amount

16   of restitution owed to each victim, that the defendant shall

17   make restitution pursuant to 18, United States Code, Section

18   3663(a) as directed to the United States.

19           The District Court Clerk is to -- do we have a list

20   of those?

21           PROBATION OFFICER:  (Handing up paper writing to the

22   Court.)

23           THE COURT:  All right.  The Court is going to make a

24   -- attach as Attachment A to this judgment a list of the

25   constitutional -- the confidential -- confidential victims

restitution list.  The Court -- it will not have addresses on
there so it will be a list of victims in the amount they are
owed in this case.  The total amount of that is $1,398,250.

Any payment that is not in full shall be divided
proportionately among the victims named.  And the defendant is
jointly and severally liable with Robert Leslie Stencil, his
co-defendants in this case, and the co-defendants that were
sentenced in that case.  Is there anybody -- or that were
tried in that case.  Is there anybody other than the -- those
folks -- I think we tried three of them and we have these
three.

MR. BOWNE:  Everyone else, with the exception of
Mr. Broyles, who is a fugitive, has pled guilty.

THE COURT:  Okay.  All right.  And Mr. Broyles, if
he comes in, Mr. Broyles may be added to the list of those who
are required to pay this.

The Court further gives notice it may involve other
defendants who may be held jointly and severally liable for
payment of all or part of the restitution and may order such
payment in the future.

It is further ordered the victim's recovery is
limited to the amount of the loss, and the defendant's
liability for restitution ceases if and when the victims
receive full restitution.

The Court finds the defendant does not have the

1  ability to pay a fine or interest in this case.

2          The Court, having considered the factors noted in

3  18, United States Code, Section 3572(a), will waive payment of

4  a fine and interest in this case.

5          The defendant shall forfeit the defendant's

6  interests in any properties identified by the United States.

7          Do we have a list of those, anything as to this

8  defendant?

9          MR. BOWNE:  There is no property for forfeiture,

10  Your Honor.

11          THE COURT:  All right.  Thank you.

12          Payment of the $200 criminal monetary penalty is due

13  and payable immediately.

14          We can pay that immediately?

15          MR. MOORE:  Yes, sir.

16          THE DEFENDANT:  Yes, Your Honor.

17          THE COURT:  Okay.  All right.  I believe that covers

18  everything.

19          Can the government think of anything else I need to

20  put in here?

21          MR. FENTON:  Yes, Your Honor.  I think we also have

22  to move to dismiss as to Mr. Fleming Counts Two through

23  Eighteen and Twenty through Twenty-nine of the Second

24  Superseding Indictment.

25          THE COURT:  Okay.  Two through Eighteen, and --

1            MR. FENTON:  Twenty through Twenty-nine.

2            THE COURT:  Twenty through Twenty-nine.

3            But anything else that I need to put in this

4    judgment?  Anything else that the government thinks would help

5    victims or anything?

6            MR. FENTON:  No, Your Honor.

7            THE COURT:  All right.  Okay.

8            MR. MOORE:  Your Honor, could I ask you for two

9    quick points?

10           One, would Your Honor be willing to include in the

11   judgment or just include on the record a statement that his

12   current job does not constitute telemarketing as Your Honor

13   has defined it.  Because what I don't want is a probation

14   officer in California go, "Hmm, how do we define

15   telemarketing?"

16           THE COURT:  Well, he's not -- I think I have already

17   said on there it's apparent his performance that he is not

18   telemarketing.  But I have no idea without knowing what the

19   company does if it's involved in telemarketing.  I have no

20   idea whether they do that.

21           MR. MOORE:  But as I understand it, Your Honor's

22   restriction is he can't personally be involved with

23   telemarketing.

24           THE COURT:  That's it.

25           MR. MOORE:  If the company itself does it, but he

1    doesn't, he's okay; is that right?

2            THE COURT:  Yes.  As long as he's not involved in it

3    himself and he's with a business, yeah, it's not a problem.

4            It's not a problem on supervision.  It may be a

5    problem for him if the company he's working with is involved

6    in a criminal telemarketing enterprise of any kind and he's

7    helping that along.  I think he understands he needs to be

8    careful about that.

9            MR. MOORE:  He does, Your Honor.

10           THE COURT:  If they're doing something illegal, the

11   fact that they are telemarketing is not going to be a problem.

12   Keeping him from telemarketing for a couple of years keeps him

13   out of the activity that he was involved in in this case,

14   which hopefully he will not be involved in in the future.

15           I do think this defendant and probably the other two

16   defendants having reviewed the heavy written information that

17   I've received from -- all you folks put a lot of stuff in

18   these cases -- are not going to be recidivists with regard to

19   this.  But there is a component of this to try to deter other

20   people.  I mean, these folks have got to get some publicity

21   out of these cases.  I imagine Mr. Stencil's guidelines will

22   be higher than some of these others were.

23           MR. MOORE:  Yes, I would imagine so.

24           Is it Your Honor's practice, do you ever recommend

25   specific institutions to the BOP or not?

1          THE COURT:  Not without there being some reason to

2    do it.

3          For instance, I did today recommended Bennettsville

4    because that person wanted to -- at least they said they

5    wanted to -- get their vocational training in automotive and

6    electric, and Bennettsville has a program for automotive and

7    electric, and so I recommended for that.  It doesn't mean that

8    the Bureau of Prisons will go along with it.  But at least I

9    have a reason for doing that.  Otherwise it's just close to

10   Los Angeles, California.

11         MR. MOORE:  Yes, sir.

12         THE COURT:  You want the one on the beach?  What's

13   the island one out there?  Is that the one he wants?

14         MR. MOORE:  No, sir.  There are two facilities, one

15   is called the Taft Correctional Institution, which I think the

16   BOP has a contract with, and then --

17         THE COURT:  They're probably going to send him to a

18   camp.

19         MR. MOORE:  And the other is Camp --

20         THE COURT:  I hate to recommend something that's not

21   a camp.  With five years -- five months, they're probably not

22   going to put him in Leavenworth.

23         MR. MOORE:  No.  I understand that he's probably

24   going to a camp as close to LA as possible.

25         THE COURT:  Right, so.

1          MR. MOORE:  And would Your Honor also consider

2    deferring his report date for a few months so that he can --

3    he needs to -- he's got an incontinence issue that he would

4    like to try to resolve --

5          THE COURT:  I have read the letter.  The letter

6    indicates the medical issues there.  How long does he think

7    it's going to take to deal with these?  Because I do not want

8    him to -- this sentence should not be something that causes

9    a -- further physical problems or death.  This is not a death

10   sentence case.

11         MR. MOORE:  Yes, sir.  I would ask for six months

12   because I think I was told it would be resolved in six months

13   and that gives him the opportunity to earn some money and pay

14   that Medicare.

15         MR. FENTON:  We would not object to six months if

16   that is appropriate under --

17         THE COURT:  For medical reasons -- it appears, I

18   mean, the doctor in the letter talks about the fact that he

19   should return to normal -- this letter was this month -- in 12

20   to 18 months.  So I think six months would not be a problem.

21   If he's still having problems you could contact me but you got

22   to have some backup --

23         MR. MOORE:  Yes, sir, understood.

24         THE COURT:  -- for me to go further than that.

25         Okay.  The Court has a letter dated July 3, 2019,

1   which the Court will make -- let's make this a part of the

2   report, from the UCLA Department of Urology which indicates

3   the post problems that are associated with prostate surgery

4   and that this defendant will hopefully be completely normal in

5   12 to 18 months, and he is requesting an additional six months

6   before he reports.

7           The Court will honor that.  And so the Court will

8   delay his report date --

9           MR. MOORE:  I'd just say January 1st, Your Honor,

10  that's six months.

11          THE COURT:  January 1st, not to be ordered to report

12  prior to January 1, 2020, because the medical reasons listed

13  in that report.

14          Okay.  Is there any legal reason why this should not

15  be the sentence in this case?

16          MR. FENTON:  No, Your Honor.

17          MR. MOORE:  No, Your Honor.

18          THE COURT:  All right.  That is the sentence in this

19  case.

20          Now, Mr. Fleming, you can appeal this conviction and

21  sentence to the Fourth Circuit Court of Appeals.

22          If you wish to appeal, any appeal must be done in

23  writing.  It must be done within 14 calendar days from when I

24  enter the written judgment in this case.  Since this is Monday

25  it will probably be entered this week.  If you wish to appeal

1  and cannot afford to appeal you may appeal at government

2  expense.  I suggest you speak with your excellent attorneys

3  about these rights and whether or not you wish to exercise

4  them.

5         But do you understand your right to appeal as I've

6  just explained it to you?

7         THE DEFENDANT:  I do, Your Honor.  Yes.

8         THE COURT:  Thank you.  Anything further from the

9  defense?

10        MR. MOORE:  No, sir, Your Honor.

11        THE COURT:  Anything further from the government?

12        MR. FENTON:  No, Your Honor.

13        THE COURT:  All right.  Thank you.  This matter is

14  concluded.

15        THE DEFENDANT:  Thank you, Your Honor.

16        (The matter is concluded at 3:24.)

17                    * * * * * *

18

19

20

21

22

23

24

25

1  UNITED STATES DISTRICT COURT
   WESTERN DISTRICT OF NORTH CAROLINA
2  CERTIFICATE OF OFFICIAL REPORTER

3         I, Laura Andersen, Federal Official Court Reporter,

4  in and for the United States District Court for the Western

5  District of North Carolina, do hereby certify that pursuant to

6  Section 753, Title 28, United States Code that the foregoing

7  is a true and correct transcript of the stenographically

8  reported proceedings held in the above-entitled matter and

9  that the transcript page format is in conformance with the

10 regulations of the Judicial Conference of the United States.

11
            Dated this the 19th day of February 2020.
12

13
                   S/Laura Andersen
14                 Laura Andersen, RMR
                   Federal Official Court Reporter
15

16

17

18

19

20

21

22

23

24

25