```
 1              UNITED STATES DISTRICT COURT
        FOR THE WESTERN DISTRICT OF NORTH CAROLINA
 2                  (Charlotte Division)

 3

 4  --------------------------x
    UNITED STATES OF AMERICA,  :
 5                 Plaintiff,:
                              :
 6                            :
    vs                        :Criminal Action 3:16-CR-221
 7                            :
                              :
 8  ROBERT LESLIE STENCIL,    :
    ET AL,                    :
 9                 Defendants:
    --------------------------x
10

11                           August 18, 2018
                             Asheville, North Carolina
12

13        The above-entitled action came on for a Status
    Conference Hearing before the Honorable MAX O. COGBURN,
14  Jr., United States District Judge, in the 2nd Floor
    Library, in the Asheville courthouse, commencing at 1:00
15  p.m.

16
            APPEARANCES:
17          On behalf of the Plaintiff:
            CHRISTOPHER RICHARD , Esquire
18          United States Department of Justice
            Criminal Division, Fraud Section
19          1400 New York Avenue, NW
            Washington, D. C. 20530
20

21          On behalf of the Defendant Robert L. Stencil:
            JOHN PARKE DAVIS, Esquire
22          Federal Defenders of Western NC
            129 West Trade Street, Suite 300
23          Charlotte, North Carolina  28202

24
    Tracy Rae Dunlap, RMR, CRR          828.771.7217
25  Official Court Reporter
```

**I N D E X**

**APPEARANCES CONTINUED:**
On behalf of the Defendant Ludmila O. Stencil:
**JEREMY BARRETT SMITH, Esquire**
Pinnacle Law
128 North McDowell Street
Charlotte, North Carolina  28204


On behalf of the Defendant Martin Delaine Lewis:
**SCOTT HADDEN GSELL, Esquire**
Law Office of Scott Gsell
101 North McDowell Street, Suite 214
Charlotte, North Carolina  28204


On behalf of the Defendant Michael Allen Duke:
**JOEL HIRSCHHORN, Esquire**Gray Robinson, P.A.
333 SE 2nd Avenue, Suite 3200
Miami, Florida  33131

**C. MELISSA OWEN, Esquire**
Tin, Fulton, Walker & Owen
301 East Park Avenue
Charlotte, North Carolina  28203

                                                  Page
Court Reporter's Certificate.................27

**P R O C E E D I N G S**

THE COURT:  Let's go ahead and call the hearing to order.  We've got a couple of things this afternoon.  We have motions to continue and to set something in January, and, also, a motion to sever.  We'll hear from whoever wants to start.

MR. HIRSCHHORN:  Well, Joel Hirschhorn for Michael Duke, along with Melissa Owen.  I filed a motion for a status conference because I thought there was a bit of a mess in terms of health issues, and I thought maybe we ought to try to focus on it.  I have not -- I did, in my motion for status conference, reference the fact I was contemplating a severance, which may or may not be necessary, depending on health issues and what the Court does.

I had a conversation -- what the Court does on scheduling.  Actually, I filed that motion before I heard about Mr. Stencil's health issues.  So I don't exactly know what his issue is, but I had spoken with Jeremy Smith about his client -- briefly about his -- not Jeremy -- I'm sorry.  I spoke to Scott Gsell about his client's health issues.  So I thought maybe we could bring it to the Court's attention.  Because the likelihood of trying this case on Monday -- on Tuesdays and Thursdays -- I mean I know things are different today than they were

back in the day, but I thought maybe we need to get these
things on.

      THE COURT:  Scott, tell me about your client.

      MR.  GSELL:  Martin Lewis has kidney failure, and
it's pretty far along.  He was on the waiting list for a
kidney donation but, because of the pending charges, he's
been taken off of that list.  He does do dialysis three
days a week:  Monday, Wednesday, Friday.  Last I talked
to him he was -- you know, he can get ready in the
morning and he goes in -- you know, it's in the early
afternoon.  It takes about four or five hours, and then
that completely wipes him out.  He goes home and he ends
up sleeping through the rest of the day and the evening,
and then he wakes up in the morning and eats a little
broth.  So he does require dialysis three days a week.

      THE COURT:  Of course if we -- you know, Scott,
let's suppose we were to sever the case and try the
others.  Then he's going to be delayed and he's going to
be on dialysis, and they're not going to put him on the
transplant list.  So the longer this thing gets delayed,
the more likely it is he'll never go to trial for the big
reason that he doesn't survive.  So, I mean, what do you
think about him not going to trial at this time and being
severed?

      MR. GSELL:  Is that being directed at me, Your

Honor?

      THE COURT: Yes, sir.

      MR. GSELL: Is that being directed to me, Scott Gsell?

      THE COURT: Yes. Can you hear me? Yes.

      MR. GSELL: I heard you, Your Honor. The only thing I can tell you is that at this point in time Mr. Lewis has indicated the case is for trial. I understand the logistical nightmare of doing it on Tuesdays and Thursdays only. I would need to confer with his medical doctors. I don't believe he is at, you know, what he would consider to be the final end stages of renal failure. He seems to -- you know, he deals mostly with child care issues and things around the house, and he seems to be able to do that. I don't know if severing Mr. Lewis from the rest of the parties -- I don't know that there would be that much of a delay and that his health would decline. But, before I could, you know, absolutely commit to that I would need to speak with his medical doctors.

      In the timeframe that this is intending, I have met with Mr. Martin in person, spoken with him, and we seem to be able to do that just fine. I don't know, you know, about the stress of the trial and dealing with, you know, significant trial preparation. I'm not sure how

1    that would physically affect him at this point in time.

2         THE COURT:  All right.  We've got a couple of --

3    we've got a couple of cases going on right now, and the

4    government -- the fraud division, I guess, is handling

5    the Stoszi case too?

6         MR. FENTON:  That might be Mr. Down.

7         THE COURT:  All right.  So we've got a couple of

8    cases going on and one of these needs to be tried in

9    September.  We've got a term.  And unless the government

10   is saying that for some reason they think that the --

11   that the defense has not had time to review all this

12   stuff --

13        MR. FENTON:  No, Your Honor.  The government's

14   position is we are ready to go to trial in September.  We

15   believe it's in the public's interest to go to trial at

16   that time.

17        With respect to Mr. Lewis, we're certainly willing

18   to make accommodations.  Obviously, it would require an

19   extensive conversation and dialogue with his physician.

20   We looked into some of the options that are available in

21   Charlotte and there are many options that are available

22   for dialysis some of which are quite close to the

23   courthouse and have good hours.

24        There's one, which is Fresenius, which is the

25   network that Mr. Lewis already visits, I understand, for

dialysis. It's about ten to 15 minutes away from the courthouse by car. It's open Monday to Saturday, which would allow Mr. Lewis an opportunity to have dialysis on one day on the weekend which would, I think, help the trial schedule overall.

Although this sounds somewhat odd, it's opened 23.5 hours a day. So it's not a full 24 hours but you could pretty much choose whenever he wants to go, save for that one-half hour. So there are options we could look at to accommodate his schedule, and the government would be willing to make whatever accommodations are necessary.

Also, we don't think those accommodations would in any way prejudice the other defendants in the case. Our concern is if we try to sever the case we're essentially going to have to try the case next --

THE COURT: That's the way it is with every case.

MR. FENTON: We don't see many differences -- we think will there would be a lot of overlap with respect to the witnesses and whatnot. We think there would be a burden not only on the government and its resources but also on the witnesses as well.

THE COURT: I'll have to hear from the doctor. I would be against severing it if there is a way that it can be done in order. The Saturday helps, but it would

1  also have to be the Tuesday and Thursday, I guess, and

2  that would switch hit him from Monday, Wednesday, Friday

3  to Tuesday, Thursday, Saturday on the dialysis.  But it

4  would have to be something --

5        MR.  GSELL:  I understand.

6        THE COURT:  Yes, sir.

7        MR.  GSELL:  Right.  I understand that, Your

8  Honor.  My concern would be on the days when Mr.  Martin

9  is doing his dialysis that his ability to meet and confer

10  with me at the appropriate level that would need to be

11  done at trial -- well it would be pretty intense.  I will

12  get additional information from his doctor, but my

13  concern would be that while he's at dialysis I wouldn't

14  be able to meet and confer with him to do trial

15  preparation, cross-examination of witnesses, presentation

16  of evidence.  His mind may very well be focused more on

17  getting his treatment.  And once the treatment is done,

18  like I said earlier, the indication is he's really

19  completely wiped out physically and needs his rest.

20        THE COURT:  Yeah.  Well I certainly want to hear

21  -- Scott, I want to hear from the doctor in detail.  I

22  don't want just some little note from the doctor.  I want

23  to hear from the doctor, in detail, about his ability to

24  do it.  I don't know how long he's had this condition,

25  but if it was during the period of time of this he

1    certainly was able to participate in business, either

2    legal or otherwise, during that period of time.

3    Frequently, you find the folks who are able to do these

4    things have a hard time concentrating when it comes down

5    to federal court.  I need to hear something about -- I

6    need to hear something from the doctor in detail.

7         MR.  GSELL:  Well what I would propose, Your

8    Honor, is I'll contact the doctor, obviously, to a larger

9    -- on Mr. Martin's behalf.  I don't think that would be a

10   problem.  I will explain to the doctor what our current

11   situation is, what our logistics are, and I will ask the

12   doctor for, essentially, his opinion on the viability of

13   whatever alternatives may exist here, and I'll look into

14   those, too.

15        And I'll ask the doctor what his opinion is with

16   regard to Mr. Martin's ability to undergo the treatment,

17   deal with the aftercare, so to say, or the after period,

18   and then engage in essentially, you know, being involved

19   in his trial at the level that he needs to be in order

20   for him to be, you know, fully involved and competent so

21   to say.

22        THE COURT:  Yeah.  Because he's going to have to

23   -- Scott, he's going to have to be involved at some

24   point.  We're not going to have the "poor defendant"

25   trial where the jury watches the defendant stagger out to

1  get his dialysis every day, and we're skipping days.

2  Whether he tries it together or alone we're not going to

3  do that.  We're going to try the case in a way that the

4  jury is going to be, to the extent it can be, unaware of

5  his medical condition.

6        MR.  GSELL:  I understand.  Hopefully, his

7  nephrologist can shed some light on that for the Court.

8  And I will -- I will contact -- this trial probably will

9  go into Tuesday or Wednesday, but I will get the

10 information over the weekend and I'll try to reach out to

11 the doctor some time on Monday.  I'm not sure how long

12 the response will take, but as soon as I'm finished with

13 this then I can engage in a lengthy conversation.  I'll

14 check in with the doctor and then I will reduce that

15 information, I guess, into a memorandum, and I'll file it

16 with the court.  Or do you want me -- is that what the

17 Court would want?

18       THE COURT:  I want a report directly from the

19 doctor.  And if we need -- if I need to have him brought

20 in to testify about it I'll bring him in to testify about

21 it.  I want a realistic assessment of the defendant's

22 physical condition.  Because at some point -- at some

23 point, absent this physical condition going south on him

24 to the point where he can't try the case, he's going to

25 have to try this case either by himself or with these

1   folks.  And I'm not going to -- I'm not going to have --
2   I'm going to make it as easy as I can on him, but I'm not
3   going to have two days of trial followed by all this --
4   and then explain to the jury that the defendant is sick
5   so that that --

6           MR.  GSELL:  Sure.

7           THE COURT:  -- so that that infects the jury's
8   decision.  Simply put, there's not supposed to be any
9   bias, prejudice, or sympathy.

10          MR.  HIRSCHHORN:  Your Honor, can I --

11          THE COURT:  Yes, sir.  Mr. Hirschhorn wants to say
12  something, Scott.

13          MR.  HIRSCHHORN:  This is not my issue but I did
14  reference a motion in my case, a motion in the Gunter
15  case, that really is as close to all fours as you can
16  get.  The only reason it comes from me is because if
17  we're in trial with Mr. Lewis it's going to be a burden
18  it's going to triple the time.  If we're on Tuesday or
19  Thursday, or Monday, Wednesday, whatever it is, it's
20  going to double or triple --

21          THE COURT:  We can't try it that way.  I
22  understand you and I agree with you.  We can't try it
23  that way.  If his dialysis can be done in a way that we
24  can do it, and not a way he wants to do it or is doing it
25  now, then that might be an option that we do.  But I

1  agree with you we're not going to try it on Tuesdays and

2  Thursdays and skip all these other days.  We're not going

3  to do that.

4      MR.  HIRSCHHORN:  The other thing is, could I

5  respectfully suggest to counsel that whatever medical

6  reports he get are filed under seal?  Because you

7  correctly observed you did not want the jury and everyone

8  has access to PACER.

9      THE COURT:  Right.

10     MR.  GSELL:  Oh, yeah.  That was the intent all

11 along.

12     THE COURT:  Okay.  Very good.

13     MR.  GSELL:  I'll make it available to the Court

14 and then allow the Court to decide what information

15 should be released.

16     MS.  OWEN:  I want to adjust so the Court has full

17 information.  At some point when we had talked about a

18 September scheduling there was a question about

19 availability of all counsel.  At that point, I wasn't

20 contemplating the possibility of September and trying

21 this on partial days of the week.

22     THE COURT:  We're not going to do that.  That's

23 not going to happen.  We're going to try this case.  I

24 mean the days may be shortened a little bit depending on

25 what he needs, if it's possible to do it.  I'm not saying

1   it's possible yet.  But if it's going to be two days a

2   week then we're -- then it's probably -- he's probably

3   going to be severed and you guys are going it alone.

4        MR.  HIRSCHHORN:  Okay.  The other issue I was

5   concerned about was some sort of report from Mr.

6   Stencil's lawyer.

7        MR.  DAVIS:  Yeah.  So Mr. Stencil's medical

8   condition is still a little bit up in the air.  He did

9   have a heart attack when he was arrested, and that's our

10  understanding, in the driveway.  At this point we don't

11  have medical records yet since it happened, I guess, two

12  weeks ago today.  I understand he is on bed rest and

13  can't -- out of work for two to four weeks and is going

14  to have a program of rehabilitation that will be at least

15  more than one time a week.  We don't know the details.

16  Apparently, the orientation for the rehabilitation is

17  next week and we'll learn more at that time.

18       Regarding the effects of the stress of the trial

19  so recently after having the stent put in.  At this

20  point, I can't really give the Court any good idea

21  because we just don't have enough information.

22       THE COURT:  Yeah, and we'd have to have something

23  like that.  It's not unusual.  When they arrested Boonie

24  Fletcher he collapsed, and they rushed him to the

25  hospital and the diagnosis was temporary paralysis

1    brought on by sudden arrest.  That's the doctor that's

2    exactly what he wrote in the report.

3        MR.  DAVIS:  This one, it seems, is a little more

4    real world.

5        THE COURT:  It sounds like it.  But I do need to

6    see what happened.

7        MR.  DAVIS:  Of course.

8        THE COURT:  Yeah.  Okay.  What says the

9    government?

10       MR.  FENTON:  Subject to confirmation by

11   Mr. Stencil's physicians, the government is, of course,

12   amenable, if there is a medical condition with

13   Mr.  Stencil and he requires treatment, to permit a brief

14   continuance to allow him to recover and participate in

15   the trial.  What the government is concerned about is a

16   situation like we had before where, essentially, the

17   introduction of new counsel, or an attempt to retain new

18   counsel, leads to a further continuance.

19       THE COURT:  Right.

20       MR.  FENTON:  We had previously dealt with this

21   situation with Mr.  Anderson where Mr.  Stencil was going

22   to sell his house, retain Mr.  Anderson, and then Your

23   Honor had given him the opportunity to do that.  We were

24   agreeable at that time to allow for a continuance.  So

25   that --

1    THE COURT:  The Court likes to see private counsel

2  in a case, where possible, so that lawyers can -- people

3  can have the lawyers they want, and lawyers can pay their

4  bills.

5    MR.  FENTON:  Right.  He can have his choice of

6  counsel.  What we would be concerned about is a situation

7  where Mr.  Stencil recovers, he's ready for trial if he's

8  physically ready to go to trial, and Mr.  Anderson makes

9  an appearance again, and we have to go through that

10  process.  So we just want to flag an issue for the Court

11  down the road.  We're agreeable for the medical and to

12  allow for recovery to the medical situation, but we don't

13  want the case to go on in perpetuity.

14    THE COURT:  The Court is going to be sensitive to

15  that.  I can't make a call without having it in front of

16  me.  But the Court, as to this hiring of counsel issue,

17  and as to whether or not that has anything to do with

18  further delay --

19    MR.  DAVIS:  Your Honor, I can represent that to

20  my knowledge -- and Mr.  Stencil has never made a secret

21  of when he was seeking additional counsel -- that that is

22  not something he is looking to do at this time.  I feel

23  quite confident that Mr.  Anderson will not be making an

24  appearance.  My understanding is that there is no efforts

25  at this time to retain additional counsel.

1          THE COURT:  All right.  Anybody else want to jump

2   in?

3          MR.  HIRSCHHORN:  On that issue or any issue?

4          THE COURT:  On any issue.

5          MR.  HIRSCHHORN:  The only potential monkey

6   wrench, Judge, is the one I sort of hinted at in my

7   motion, and that is the possibility of a severance.

8   Mr.  Duke has provided me with a list of 19 witnesses --

9   actually, 22 witnesses because he has an included three

10  of the defendants, because he didn't understand this is

11  not a civil case where you just get to call people.  I am

12  exploring whether or not I can, in good faith, file a

13  motion for severance on the grounds of antagonistic

14  defenses or, even if the defense is not antagonistic,

15  whether I need a separate trial because I want to extract

16  certain evidence from Mr.  Stencil, possibly from

17  Mr. Lewis, and also from --

18         THE COURT:  You'll probably never have a

19  conspiracy trial if we did everybody together.  Everybody

20  would be severed.

21         MR.  HIRSCHHORN:  I understand that, Your Honor.

22         THE COURT:  Defendants would say, Judge, I want to

23  call so-and-so, and he's going to say something good

24  about me.  And then when the time comes, well, maybe he's

25  not going to say something good about me.

 1      MR.  HIRSCHHORN:  I haven't had the discussions

 2 with the proposed witnesses's lawyers here yet because

 3 I'm trying to sort out through the independent witnesses

 4 whether there is a viable motion for severance.

 5      THE COURT:  We'll certainly listen to you when you

 6 make it.

 7      MR.  HIRSCHHORN:  I know you will.  But I just

 8 wanted you to know I'm working on that and will get it to

 9 you -- as expeditiously to you as possible if that's what

10 we decide to do.

11      THE COURT:  Okay.  I need to find out all this

12 information with regard to the -- to the condition of

13 Scott's client, first of all, with regard to that to and

14 decide about that severance.  I also need to hear about,

15 J. P., your guy and as to whether or not that's going to

16 throw a wrench into the September trial term or not.

17 Those are the first two things that I need to see, and

18 then I'll deal with anything additional Mr. Hirschhorn

19 brings with regard to severance or whatever.

20      I've got a couple of cases to try here and would

21 like to get them both tried but certainly would want to

22 try one of these cases if possible.  It sounds like the

23 government's ready to go.

24      MR.  GSELL:  Does Your Honor have a date you would

25 like the information -- I'm sorry.  Does Your Honor have

1  a date you would like the information from Mr. Lewis's

2  doctor by?

3       THE COURT:  Yeah.  If you're going to talk to him

4  next Monday I'd like it ASAP after that.

5       MR.  GSELL:  Okay.

6       THE COURT:  I mean I realize that this is not --

7  this will not be his most lucrative job in preparing that

8  but we do need it.  And, you know, if it's sufficiently

9  detailed and the Court doesn't have any other questions

10 it might save him a trip over to the courthouse down

11 there.

12      MR.  GSELL:  Okay.

13      THE COURT:  I'd like to get it ASAP because that's

14 a big deal in this case as to what we're going to do.

15 Now I'm not going to rule on that if we continue it for

16 Mr.  Stencil.  If we do that, if we're going to have to

17 continue it for another defendant, then we'll just leave

18 it together because your client's issue may resolve

19 itself or not depending on, you know, going to January.

20 But the longer he's charged the less chance he's going to

21 have to be on the list.  I don't know whether they put

22 you on the list if you lose and are in prison or not.

23      MR.  GSELL:  My understanding, Your Honor, is that

24 the issue is independently done.  They looked at him and

25 decided with the charges, and if he was going to go to

prison, he would not get the -- if there was a chance he
would not get the appropriate care for a donated kidney,
they don't like risking a donated kidney under those
circumstances. That's why they took him off the list.

THE COURT: They do pretty well in federal prison
on most medical stuff. We certainly don't want this to
be a death sentence. I don't believe the death penalty
is in play for your client at all so we don't want that
to occur.

MR. GSELL: Correct.

MR. HIRSCHHORN: Judge, if I understand what
you're saying --

THE COURT: Yes, sir.

MR. HIRSCHHORN: -- we're going to get medical
information for you to review --

THE COURT: Next week.

MR. HIRSCHHORN: -- on behalf of Mr. Lewis.

THE COURT: Thankfully, having this hearing today,
we'll get that next week. So we can still -- September
is still in play. If it goes away, it goes away not
because we had the hearing too late but because of these
issues.

MR. HIRSCHHORN: We're waiting on Mr. Stencil's
medical.

THE COURT: I've got to hear what happened with

1   him.

2       MR.   HIRSCHHORN:   Does the Court -- I mean,

3   scheduling-wise, if you're going to wind up putting it

4   over, what term are you looking at?  I mean some of it

5   will depend on whether he's severed out or not and what

6   Mr. Stencil's position is -- his physical position is.

7       THE COURT:  I don't know.  We'll have to see.  It

8   will be the week of Thanksgiving, or it will be December

9   or January.  We'll have to talk about that.  There will

10  be speedy trial issues and those kinds of things we will

11  be talking about.  The defendants would have some say-so

12  in there if the Court were to decide that November was

13  not a good time.  I don't like to have juries go out on

14  Fridays because I don't want date night or anything else

15  to interrupt the process of deliberation and have that

16  one that you've convinced that your client's not guilty

17  to give up the holdout because they've got a really good

18  Tinder opportunity.

19      MR.   HIRSCHHORN:   You mean the one I convinced the

20  government hadn't met its burden of proof.

21      THE COURT:  Exactly.

22      MR.   HIRSCHHORN:   There is a distinct difference.

23      THE COURT:  There is.  There is.  By the same

24  token, I'm not sure I want to be trying too much around

25  Thanksgiving.

1     MR. HIRSCHHORN: So do we have -- can we have

2  sort of like a control date or something? I mean I'm

3  just -- my practice is a lot different today than it was

4  back in the day, Judge. I have very few cases. I just

5  like to know when and where to go.

6     THE COURT: Right now it's September. If we go

7  off after September we'll quickly decide when that's

8  going to be. It's either going to be the -- it's either

9  going to be -- probably, if it's the week of Thanksgiving

10  the only thing that would happen would be we'd select a

11  jury and we'd go home and come back after Thanksgiving

12  and try the case. If it's the -- if it goes -- or else

13  it will go to January. So we'll talk about that.

14     MR. HIRSCHHORN: Okay.

15     THE COURT: We'll talk about that. That's a

16  little problematic. I'm trying to move my terms to the

17  first of the month -- well I think I'm going to be able

18  to. We really have a courtroom problem. With things

19  switching around, I think if I can get Judge Whitney and

20  Judge Conrad -- Frank Whitney moved upstairs -- we're

21  building a new building in the back so he's moved

22  upstairs because they're going to be essentially

23  destroying that office where he was. And Ken Bell is

24  coming in.

25     If Ken and I can have Courtroom 1 on the first

floor we can work that out and I can try cases the first
part of the month and then they can take Courtroom 2,
which is our Potter courtroom, our ceremonial courtroom.
Now when we get the new courthouse we're going to have
courtrooms to spare, including a Jeffersonian courtroom
that Judge Conrad loves from up in Virginia where the
judge sits up here, the jury sits below him looking at
the witness, the witness is there in a dock, and the
attorneys are -- everybody's firing things at the
witness.

     MR. HIRSCHHORN:  That's very -- is the defendant
still in the courtroom?

     THE COURT:  Oh, yeah.  The defendant is standing
there.  Oh, yeah.  The witness is there, the defendant is
there -- it's an interesting concept.  I'm going to try
it some time but, you know, that's been around since the
1700s and it's not caught on nationally.  So we are going
to have one.  We are going to have one courtroom there,
and Bob is going to do that one.  He loves that, so he's
going to do that courtroom.  Then we'll be loaded with
courtrooms for a while.

     MS. OWEN:  What about Statesville?

     THE COURT:  Yeah, we could try it in Statesville

     MS. OWEN:  I wasn't requesting that.  I was not
making that request.

1      THE COURT:  Yeah.  We are going to try cases in

2   Statesville during that period of time.  We thought we

3   might be able to use Mecklenburg but, apparently,

4   Mecklenburg doesn't have room for the judges they've got

5   and for the cases they've got.  They're all crammed up

6   down there even in that beautiful new courthouse.

7   They've got a great courthouse down there and it's

8   already obsolete in terms of space.

9      All right.  So that's where we are.  We'll know

10   something pretty quick because you -- I need you to get

11   that stuff in ASAP.  You can do that.

12      MR.  DAVIS:  We will move on that.

13      THE COURT:  He can have this next week.  If you

14   can have it then I can digest it and have another

15   conference by phone and make some decisions about

16   September.

17      MR.  DAVIS:  We will aim to get that done as

18   quickly as possible, and we'll have something next week.

19   The only difficulty here is this is entirely emergency

20   room treatment that was done through the Marshals'

21   Service and, you know, we don't exactly know where all

22   the moving parts are and who is going to be treating him

23   going forward.  But we will pull together everything we

24   can possibly pull together and present that to the Court,

25   regardless.

1    THE COURT:  If they put a stent in there probably

2 was some kind of cardiac event.  So we need to -- but I

3 do need to find out what his availability is for late

4 September.

5    MR.  DAVIS:  Absolutely.

6    THE COURT:  Very good.  Okay.  Anything else that

7 we need to talk about?

8    MR.  GSELL:  Not for Mr. Lewis.

9    THE COURT:  Okay.  Very good.  Thank you for

10 calling in, and good luck.  I hope justice prevails in

11 your trial one way or the other.

12    Do we have a time estimate from the government so

13 we can plan for possibly two trials?

14    MR.  FENTON:  We think it will take ten days.

15    MR.  HIRSCHHORN:  That's take not taking into

16 account defense evidence.

17    MR.  FENTON:  We have 15 to 18 witnesses.

18    THE COURT:  That won't take two weeks.  You're

19 calling 15 to 18 witnesses?  We'll get through your

20 evidence and it will take two weeks.

21    MR.  HIRSCHHORN:  Yeah.

22    THE COURT:  We'll have the time.  We'll probably

23 have about three weeks for this trial.  If we have to --

24 it will take as long as it takes, but I think we'll be

25 able to bleed over.  I'll warn the other judges it may

1  bleed over to one of their times.

2       MR.  SMITH:  Just to make -- this is Jeremy Smith,

3  attorney for Ludmila Stencil.  Just to make Your Honor

4  aware, Judge Conrad and I have a trial set for two weeks

5  after the date that this one is supposed to start in

6  September.  It's a human trafficking case in front of

7  Judge Conrad that I am 95 percent sure is going to be a

8  trial, and October the 1st, I believe, is the docket

9  call.  So, I mean, I'll let you-all fight over me but I

10 just wanted to make you aware of that, Your Honor.

11      THE COURT:  If we've got you in trial then they'll

12 just have to wait while we finish up with you.

13      MR. SMITH:  That's fine.

14      THE COURT:  Hopefully, it will go a little quicker

15 than we think.  Usually, the trials do.  I mean, you

16 know, they usually go quicker you think they do.  I'd

17 start winnowing the evidence down, when I was the

18 prosecutor, to try to get it down before I lost the jury.

19 I went, you don't want to lose them by having too much.

20      MR. SMITH:  Yes, sir.  I just wanted to bring that

21 up.

22      THE COURT:  I let people try their case.  It's a

23 little different.  Everybody has a different style.  Some

24 jump in there and with a little more --

25      MR.  HIRSCHHORN:  You were looking for more

1  flamboyant than others.

2       THE COURT:  Some are a little more flamboyant than

3  I am.

4       MS.  OWEN:  To add to what Mr. Smith says.  I had

5  started to mention this earlier when I was concerned

6  about the trying of every other day or every three days.

7  On October 5th I've secured -- I've filed a Notice of

8  Unavailability.  It is not nearly as important as

9  Mr. Smith's trial but it is my 20th wedding anniversary

10 trip to Paris.

11      MR.  SMITH:  I disagree.  That's more important,

12 but that's just my opinion.

13      MS.  OWEN:  There are consequences if I delay the

14 trip.

15      THE COURT:  If the trial goes long at least we'll

16 always have Paris.

17                   (Laughter.)

18      MR.  HIRSCHHORN:  I was sweating out verdicts on

19 my 10th and 25th wedding anniversaries.

20      THE COURT:  It happens.  We've got some serious

21 issues we need to look at, and we'll know more next week.

22 But if we -- let's wait and see what happens.  Let's

23 don't speculate.  We may be able to get this thing tried

24 in September.

25      All right.  Anything else?

1       MR.  GSELL:  No, Your Honor.  Thank you.

2       THE COURT:  All right.  Thank you.  Very good.

3              (Off the record at 1:28 p.m.)

4                      **CERTIFICATE**

5       I, Tracy Rae Dunlap, RMR, CRR, an Official Court
Reporter for the United States District Court for the
6  Western District of North Carolina, do hereby certify
that I transcribed, by machine shorthand, the proceedings
7  had in the case of UNITED STATES OF AMERICA versus ROBERT
LESLIE STENCIL, ET AL, Criminal Action Number
8  3:16-CR-221, on August 17, 2018.

9       In witness whereof, I have hereto subscribed my
name, this 15th day of April, 2020.

10

11              __/S/__Tracy Rae Dunlap__
                TRACY RAE DUNLAP, RMR, CRR
                OFFICIAL COURT REPORTER
12

13

14

15

16

17

18

19

20

21

22

23

24

25